UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
BREEZE CONSTRUCTION INC.,

       Crossclaim Plaintiff and Defendant,　　**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

- v -　　　　　　　　　　　　　　　　　　　CV-03-2452 (VVP)

CGU INSURANCE COMPANY,

       CrosLaim Defendant,

and XL SPECIALTY INSURANCE COMPANY,

       Crossclaim Plaintiff and Defendant.
----------------------------------------------------------------x

Upon the evidence adduced at trial, the court makes the following findings of fact and reaches the following conclusions of law:

## FINDINGS OF FACT

1. The crossclaims at issue here arise from an action brought by a union and various associated welfare benefit funds[1] (hereinafter sometimes referred to as "the plaintiffs") in which all the crossclaimants here were named as defendants.

2. The crossclaimant Breeze Construction Inc. is a masonry contractor whose principal is Tariq Khokar.

3. In approximately 2002 and 2003, Breeze served as a subcontractor to Phoenix Services Corporation on school construction projects for the New York City School Construction

---

[1]The named plaintiff was Santo Lanzafame, who was suing in his official capacity as Trustee of the Pointers, Cleaners, and Caulkers Welfare, Pension and Annuity Funds, and in his official capacity as President of the Bricklayers and Allied Craftworkers Local Union No. 1, New York.

Authority (the "SCA") in Queens at P.S. 40 and P.S. 84. Khokar and Breeze worked with Phoenix on various other SCA school construction projects as well.

4. Phoenix Services Corporation is an approved contractor for SCA projects whose principal is Edward Lama.

5. CGU Insurance Company ("CGU") executed a bond under which it served as surety for any obligations owed by Phoenix to its subcontractors for labor and materials provided by subcontractors on the project at P.S. 40.

6. The crossclaimant XL Specialty Insurance Company ("XL") executed a bond under which it served as surety for any obligations owed by Phoenix to its subcontractors for labor and materials provided by subcontractors on the project at P.S. 84.

7. In the main action, the plaintiffs alleged that Breeze had failed to comply with its obligations under a collective bargaining agreement to make contributions to the welfare benefit funds and to pay dues owed to the union by Breeze's employees in connection with a number of projects on which Breeze had worked. The plaintiffs further alleged that as the bonding companies for Phoenix on the projects at P.S. 40 and P.S. 84, CGU and XL were liable for the amounts owed by Breeze with respect to any work done on those projects. The claims of the plaintiffs have all been resolved by settlement, leaving the crossclaims here.

## BREEZE'S CLAIMS

8. Breeze contends that Phoenix failed to pay the full amounts owed to it as a subcontractor on the construction projects at P.S. 40 and P.S. 84, and that CGU and XL are

therefore liable to Breeze under the surety bonds they issued, respectively, in connection with the work done on those projects.

**P.S. 40**

9. Pursuant to bidding, Phoenix was awarded a contract for certain renovations at P.S. 40 in Queens, including masonry and windows. Phoenix thereafter entered into an agreement with Breeze concerning masonry work to be done at the school. The agreement was oral, and its terms were sharply disputed in the testimony.

10. Khokar testified that he was supposed to be listed as the subcontractor, but that another contractor would actually do the work. For his service as a figurehead he was to be paid $2,500 per week, and Phoenix would take care of all other aspects of the job. Tr. 58-59.

11. Lama testified that the masonry work at P.S. 40 was initially undertaken by Phoenix, but when Phoenix's masonry apprenticeship program did not meet SCA requirements, Phoenix sought out Breeze to complete the work. Breeze met SCA requirements because it was an approved contractor and had union affiliation. Lama further testified that his agreement with Breeze was not a lump sum contract, but rather a "time and materials" contract under which Phoenix paid Breeze $2,500 for managerial oversight and also separately paid for labor and materials Breeze supplied to the jobsite, including any union obligations. Tr. 241-42. Checks submitted in evidence by Phoenix disclose that over a period of time from late May 2002 to mid-August 2002 Phoenix made payments of $2,500 per week to Breeze, as well as a number of other payments in odd dollar amounts ranging from $11,268.50 to $24,488.12, which in total amounted to over $261,318.00. Ex. AA.

12. Khokar testified that Breeze was still owed $150,000 for the work performed at P.S. 40, a sum which included $65,000 for unpaid management fees, $30,000 for office expenses, $50,000 for tax liabilities, and $5,000 for accounting expenses. Tr. 99-101; 150-53. Breeze offered no documentary evidence to substantiate any of the amounts.

## **P.S. 84**

13. Pursuant to a bidding procedure, SCA awarded a contract to Phoenix for renovations at P.S. 84 in Queens, including masonry, windows, roofing, and perhaps other items. Tr. 247-48.

14. In or about September 2002, Phoenix entered into a written contract with Breeze under which Breeze was to provide labor, materials and equipment for all masonry work to be done at the school in accordance with the drawings and specifications for the project. Tr. 248-51. The contract, which was embodied in a standard form of agreement known as an "AIA" form,[2] further provided that Phoenix would pay Breeze $450,000 for that work. Ex. T.

15. By letter dated October 24, 2002, Breeze requested an increase of $125,000 in the contract price because of various items of work that Khokar argued were different from what he had anticipated. Ex. 12. Phoenix rejected that request. Tr. 160.

16. Pursuant to the contract, Breeze performed masonry work at P.S. 84 and continued to perform masonry work there until late June of 2003. On June 2, 2003, Khokar signed a document entitled "Partial Waiver of Lien" in which he acknowledged accepting $25,000 on behalf of Breeze in partial payment of amounts owed under the contract for P.S. 84,

---

[2] "AIA" stands for American Institute of Architects and the full name of the form is "Standard Form of Agreement Between Contractor and Subcontractor." Ex. T.

and further acknowledged that the total amount of payments made to Breeze by Phoenix up to that date for the work at P.S. 84 was $385,706.74. Tr. 166-68, 258-59; Ex. Y.

17. Khokar testified that Breeze received only $184,000 in payment for the masonry work Breeze performed at P.S. 84. He contends that Breeze is owed a total of $473,225 by Phoenix, which represents the difference between what Khokar contends the actual contract price should have been, $657,225, and the $184,000 he contends he was paid. See Ex. 18; Tr. 97. Breeze offered no books, records, or documents of any kind to corroborate Khokar's testimony about the payments received by Breeze or the additional amounts owed by Phoenix, over and above the contract price of $450,000, in connection with the work performed by Breeze on P.S. 84.

18. On or about June 23, 2003, Phoenix issued a letter to Breeze directing Breeze to suspend its operations at P.S. 84. Ex. U. The suspension letter advised Breeze that employees of Breeze had complained that they were not being paid appropriate wages, and that Breeze might therefore be in violation of the contract. The letter requested a meeting with Khokar and his employees to discuss the matter on the following Tuesday at 1:00 p.m. Khokar did not respond to the letter and did not attend the meeting. Tr. 256-57.

19. Breeze took no further action with respect to the allegation that appropriate wages were not being paid, and offered no proof at trial that it was paying prevailing wages to its workers. Breeze did not perform further masonry work at P.S. 84 after June 23, 2003.

20. On or about July 10, 2003, Phoenix made payments to Breeze workers to compensate them for shortfalls in the wages that Breeze was supposed to have paid them under prevailing wage law. Tr. 251-53; Ex. DD. The amounts paid totaled $16,223.

21. Phoenix subsequently retained another masonry contractor, Adams European Contracting, Inc., to complete the masonry work at P.S. 84. Tr. 257. Phoenix paid Adams European a total of $36,165.15 for that work. Tr. 267; Ex. CC, FF.

22. During the course of the work performed by Breeze at P.S. 84, Phoenix paid for various items of materials, equipment and other expenses which were items for which Breeze was responsible under the contract. These items included scaffolding, containers, and other miscellaneous materials and equipment. Phoenix advised Breeze of these items, or "back charges," by providing Khokar with copies of invoices paid by Phoenix which reflected the amounts that Phoenix was backcharging against the contract. Tr. 268-69; Ex. FF. Although Lama testified that Phoenix also provided itemized lists of the backcharges to Breeze, Tr. 307-08, Phoenix offered no such lists or other documentary evidence to substantiate that assertion.

23. Some, but not all, of the invoices offered in evidence as Ex. FF contain written notes to indicate that they were to be backcharged to Breeze or that they concerned materials and equipment that were to be charged to Breeze. Excluding any invoices without such notations, the total dollar amount of sufficiently notated invoices comes to more than $23,118. See Ex. CC.

24. Phoenix made a payment in the amount of $20,000 to the union's "PCC Benefit Fund" on behalf of Breeze in connection with the masonry work performed at P.S. 84. Tr. 266-67; Ex. CC.

## XL'S CLAIM

25. XL contends that Breeze is liable to it for monies expended to settle the claims made against it by the plaintiffs – *i.e.*, the union and the various welfare benefit funds – in the main action.

26. Phoenix and Lama agreed to indemnify CGU and XL in connection with any claims made upon the bonds CGU and XL issued for the work done at P.S. 40 and P.S. 84, respectively. Tr. 278-80; Ex. EEE.

27. As indemnitor for the claims made upon the bonds issued by CGU and XL, Phoenix and Lama entered into a settlement agreement with the plaintiffs concerning the obligations allegedly owed by Breeze to those entities in connection with work at both P.S. 40 and P.S. 84. Tr. 280-85; Ex. EEE. Under the agreement, Phoenix and Lama were required to pay a total of $42,000 to the plaintiffs in settlement of those obligations. Ex. EEE. Phoenix made at least one payment of $21,000 in satisfaction of its obligations under the settlement agreement. Tr. 285-87; Ex. DDD. Neither Breeze, on the one hand, nor CGU or XL, on the other, signed the settlement agreement, and none of them were otherwise parties to that transaction. Nor did Breeze acknowledge the validity of the claims made by the union and the welfare benefit funds.

28. Lama testified that Phoenix and he assigned to XL their claims against Breeze for the amounts paid to settle the claims made by the plaintiffs based on the allegations that Breeze had not paid its obligations to the plaintiffs with respect to work done at P.S. 40 and P.S. 84. No documentary evidence was offered to corroborate that testimony.

# CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction to decide the cross-claims made by Breeze and XL Insurance pursuant to 28 U.S.C. § 1367 because they arise from the same factual circumstances as, and are intertwined with and related to, the claims made by the plaintiffs against them arising under ERISA, over which this court had original jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

2. The crossclaims at issue here are all claims for breach of contract. "Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994) (*citing Bank Itec N.V. v. J. Henry Schroder Bank & Trust Co.*, 612 F. Supp. 134, 137-38 (S.D.N.Y. 1985)). When a construction contractor is properly terminated, the contractor is responsible for the fair and reasonable cost of completing the constrction. *See Ferreira v. Saccento*, 286 A.D.2d 366, 366, 729 N.Y.S. 2d 178, 179 (2d Dep't 2001) (*citing Kaufman v. Le Curt Construction Corp.*, 196 A.D.2d 577, 601 N.Y.S.2d 186, 188 (2d Dep't 1993)). On the other hand, if a general contractor seeks offsets against the contract price promised to a subcontractor, the general contractor has the burden of proof. *See Jerry B. Wilson Roofing and Painting, Inc. v. Jobco–E.R. Kelly Associates, Inc.*, 151 A.D.2d 896, 897, 542 N.Y.S.2d 867, 868 (3d Dep't 1989).

3. Breeze and Phoenix entered into an oral agreement in connection with a construction project at P.S. 40 in Queens for which Phoenix served as the general contractor. Under the terms of the oral agreement Phoenix was to pay Breeze $2,500 per week for as long as

Breeze was identified as the masonry subcontractor on that project, and Phoenix was otherwise responsible for all expenses, including labor and materials, incurred in connection with the masonry work supplied at that construction project. Breeze did not prove by a preponderance of the evidence that Phoenix was responsible for Breeze's office expenses during the life of the agreement or for unspecified tax liabilities and accounting expenses.

4. Breeze has not proved by a preponderance of the evidence that Phoenix failed to pay Breeze all of the sums owed for the weeks that Breeze was identified as the masonry subcontractor for the construction project at P.S. 40. Breeze has not proved by a preponderance of the evidence that Breeze incurred $50,000 in tax liabilities or $5,000 in accounting expenses in connection with the construction project at P.S. 40 for which Phoenix was responsible.

5. Breeze and Phoenix entered into a written contract under which Breeze was required to supply all labor, equipment and materials needed to perform masonry work as a subcontractor on a construction project at P.S. 84 in Queens for which Phoenix was the general contractor. Phoenix was required to pay Breeze $450,000 for that work.

6. Phoenix made payments to Breeze totaling $385,706.74 for the work performed by Breeze at P.S. 84.

7. Breeze failed to complete the work required by the contract and was properly terminated by Phoenix. Under the terms of the contract, Phoenix was entitled to hire a substitute contractor to finish the work and to offset the reasonable amount paid to complete the work against the contract amount owed to Breeze. See Ex. T ¶ 7.2.1. The amount paid to Adams European to complete the work, $36,165.15, was reasonable.

8. Under the terms of the contract, Phoenix was allowed to charge Breeze for any services or materials provided by Phoenix to Breeze to perform the masonry work. See Ex. T ¶ 3.3.2. The appropriately charged backcharges for such items totaled at least $23,118. It is not entirely clear that compilations of the backcharges were provided to Breeze as required by paragraph 3.3.2.2 of the contract. Any breach of that obligation that may have occurred, however, should not deprive Phoenix of the right to obtain credit for backcharges that were not itemized on a compilation, because Breeze was otherwise placed on notice of the backcharges when Khokar was provided with copies of the invoices reflecting the backcharges.

9. Under the terms of the contract, if Breeze failed to carry out its work in accordance with the contract, Phoenix was entitled to correct any such deficiencies and deduct the reasonable cost from the payments to be made to Breeze. See Ex. T ¶ 3.4. Under the terms of the contract, Breeze was required to "comply with laws, ordinances, rules, regulations and orders of public authorities bearing on performance of the Work." Ex. T ¶ 4.2.1. The payment of prevailing wages was required in connection with the work performed at P.S. 84. Tr. 251. Thus, the amounts paid to Breeze's workers by Phoenix totaling $16,223 to compensate them for shortfalls in prevailing wages is deductible from the amount to be paid to Breeze under the contract.

10. Similarly, the payment by Phoenix of $20,000 to the union for benefit fund contributions owed by Breeze is deductible from the amount to be paid to Breeze under the contract because the making of such contributions to union benefit funds in connection with union work is required by ERISA. *See generally* 29 U.S.C. § 1145.

11. The defendants proved by a preponderance of the evidence that the amount paid by Phoenix to complete the work that Breeze was supposed to perform under the contract ($36,165.15), coupled with deductions which were appropriate under paragraph 3.4.1 of the contract ($36,223) and backcharges for which Breeze was responsible under paragraph 3.3.2 of the contract ($23,118), when added to the amount paid to Breeze for its work ($385,706.74), exceeded the amount of $450,000 due to Breeze under the terms of the contract. (Even if the backcharges are excluded due to the alleged breach of the obligation to provide written compilations of backcharges, the amounts paid or otherwise charged to Breeze exceed the contract price.)

12. Breeze has not proved by a preponderance of the evidence that Phoenix failed to pay all sums due to Breeze under the contract for work performed by Breeze at P.S. 84.

13. As Breeze has not proved that Phoenix failed to pay sums it owed to Breeze under the contracts between Phoenix and Breeze in connection with work at P.S. 40 and P.S. 84, Breeze has not proved that Phoenix's bonding companies, the crossclaim defendants XL Insurance and CGU Insurance, are liable to Breeze under the payment bonds they issued.

14. XL did not prove by a preponderance of the evidence that Breeze is liable to it for the $21,000 payment made by Phoenix and Lama under their settlement agreement with the plaintiffs.

15. There are a number of deficiencies in XL's proof. First, there is no proof that Breeze was actually in default of any obligations under its collective bargaining agreement with the union. The fact that Phoenix and Lama decided to resolve any such claims by settlement is not proof that the claims had merit.

16. Second, XL's claim against Breeze in this action, as set forth in the pretrial order, was for monies paid "by or on behalf of XL" to the plaintiffs. Joint Pretrial Order, ¶ iv(c). The settlement agreement, however, does not distinguish between XL and CGU with respect to the monies to be paid on their behalf by Phoenix and Lama. Nor was there any other proof offered to substantiate what portion of the monies to be paid were paid on behalf of XL.

17. Finally, the proof of the assignment itself was insufficient to satisfy the court that an assignment had in fact been made. The testimony by Lama was devoid of any details about when the assignment occurred, who agreed to accept the assignment on behalf of XL, whether there was any consideration for the assignment, or about any of the terms of the assignment. The lack of detail raises significant doubt about the assignment, leading to the conclusion that XL has not proved by a preponderance of the evidence that an assignment was actually made. Moreover, in the absence of a writing, any such assignment is not recognized by New York law without proof of valid consideration. *See Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 380 F.3d 624, 643-44 (2d Cir. 2004)("Under New York law, an assignment . . . may be made without writing or delivery of any written statement of the claim assigned, . . . provided only that the assignment is founded on a valid consideration between the parties.") (citation and internal quotations omitted).

18. For the foregoing reasons the court concludes that Breeze has not prevailed on its claims against XL and CGU, and that XL has not prevailed on its claim against Breeze.

19. Judgment is to be entered accordingly.

**SO ORDERED:**

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
      February 5, 2010